UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
NO: 5:12-CV-00362-BR

| | | |
|---|---|---|
| MGHC GROUP, LLC, | ) | |
| | ) | |
| v. | ) | ORDER |
| | ) | |
| SOMERSET PROPERTIES SPE, LLC | ) | |

Before the court is an appeal by MGHC Group, LLC ("MGHC") from the 12 April 2012 order of United States Bankruptcy Judge Stephani Humrickhouse. In that order, the bankruptcy court allowed the objection by the debtor, Somerset Properties SPE, LLC ("Somerset"), to MGHC's proof of claim. In sum, the court concluded that MGHC's claims against Somerset fail under New Jersey law. For the reasons set forth below, the decision is affirmed.

## I. BACKGROUND[1]

In 2005, MGHC and Mill Ridge Farm IV, LLC ("Mill Ridge Farm") entered into an agreement pursuant to which Mill Ridge Farm agreed to construct a commercial building on property in New Jersey (the "Property") and sell it to MGHC. The agreement provided for a purchase price of $4,500,000, with MGHC to advance to Mill Ridge Farm up to $3,200,000 against the purchase price pursuant to a promissory note secured by a mortgage on the Property. MGHC ultimately advanced more than $3,500,000 during construction, but the project was not fully completed.

In November 2007, MGHC initiated a foreclosure action in New Jersey, and in August 2008, the New Jersey state court found that Mill Ridge Farm was in default and directed that a non-contested foreclosure proceed. MGHC purchased the Property at a foreclosure sale.

---

[1]The facts are taken primarily from the bankruptcy court's 12 April 2012 order.

Subsequently, MGHC filed a separate action in New Jersey state court against Somerset and multiple other defendants, including Mill Ridge Farm. In its complaint, MGHC alleges that the defendants conspired to convert its property and to defraud it. Specifically, MGHC contends that money advanced to Mill Ridge Farm was diverted from the construction and development of the Property to fund the purchase of Somerset's property in North Carolina. This diversion of funds was purportedly accomplished by way of fraudulent transfers by Mill Ridge Farm, through its sole member, Kevin Wilk, and by Mill Ridge Group, Inc. ("Mill Ridge Group") to MW Holdings, LLC (of which Wilk is the managing member); which has an ownership interest in Falls of Neuse Investments, LLC; which has an ownership interest in Somerset Associates, LLC; which is the sole owner of Somerset. MGHC alleges the following causes of action against Somerset: conversion, unjust enrichment, constructive fraud, actual fraud, and civil conspiracy.

On 8 November 2010, Somerset filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code in this district. MGHC sought relief from the automatic stay to continue the New Jersey litigation against Somerset. The bankruptcy court denied that request and subsequently allowed MGHC to file its proof of claim, which, as amended, is for $481,000. After Somerset objected to MGHC's proof of claim and after an evidentiary hearing thereon, the bankruptcy court allowed Somerset's objection. MGHC appeals from this order.

## II. DISCUSSION

"Under 28 U.S.C. § 158(a), United States District Courts have jurisdiction to hear appeals of final judgments, orders, and decrees of Bankruptcy Courts. On appeal from the Bankruptcy Court, the district court acts as an appellate court and reviews the Bankruptcy Court's findings of fact for clear error, while it reviews the conclusions of law *de novo*."

Singleton v. Countrywide Home Loan, Inc. (In re Singleton), 358 B.R. 253, 256 (D.S.C. 2006). Pursuant to Federal Rule of Bankruptcy 8013, the district court "may affirm, modify, or reverse a bankruptcy judge's judgment, order, or decree or remand with instructions for further proceedings."

MGHC contends that the bankruptcy court erred in holding that no trust relationship existed between MGHC and Mill Ridge Farm, and, independent of the existence of any trust relationship, the court erred in rejecting MGHC's claims of constructive fraud and unjust enrichment. (See Br., DE # 17, at 6.[2]) The court addresses these contentions in turn.

**A. Relationship between MGHC and Mill Ridge Farm**

Central to the majority of the bankruptcy court's analysis is its conclusion that a debtor-creditor relationship, rather than a trust relationship, existed between MGHC and Mill Ridge Farm. The nature of the relationship between these entities is critical to understanding the legal rights and duties of each respective party vis-a-vis the funds advanced to Mill Ridge Farm by MGHC. MGHC contends that the bankruptcy court's analysis under New Jersey law[3] is incorrect and that a trust was established (1) by operation of statutory law, (2) by operation of contract, and (3) based on the attendant circumstances.

   *1. Statute*

Relying on N.J. Stat. Ann. §§ 2A:44A-1 *et seq.* (2011) and 2A:102-10[4] (repealed 1979),

---

[2]Docket entry page citations are to the page numbers generated by CM/ECF.

[3]As the bankruptcy court recognized, the parties agree that New Jersey law applies. (DE # 1-1, at 5.)

[4]MGHC actually cites to N.J. St. Ann. § 2A-102:11, (see Br., DE # 17, at 12-13), which was repealed at the same time as § 2A-102:10 and applied to money received by a *subcontractor*. The statutory language MGHC quotes was in § 2A-102:10.

3

MGHC argues that, as a matter of law, Mill Ridge Farm was obligated to hold the money that MGHC advanced to it in trust. Former § 2A:102-10 provided:

> "All moneys received by a contractor from the owner or mortgagee of real estate or any leasehold or other interest therein, for the purpose of having a building erected, constructed, completed, altered, repaired or added to, are trust funds in the hands of the contractor to be applied to the amount of all claims due or to become due and owing from the contractor to all persons furnishing labor or materials to him for the erection, construction or completion of the building or any alteration, repair or addition thereto, and any other reasonable and necessary charge in connection therewith. Any contractor or any officer, director or agent of the contractor, who pays or consents to the appropriation of such funds for any other purpose prior to the payment of all claims and charges for the payment of which the funds constitute a trust fund, is guilty of a misdemeanor."

Plevy v. Schaedel, 130 A.2d 910, 911-12 (N.J. Super. Ct. Law Div. 1957) (quoting N.J. St. Ann. § 2A:102-10). This criminal statute was replaced by another criminal statute, N.J. St. Ann. § 2C:20-9. In re Cent. Piping Inc., 4 B.R. 298, 303 n.5 (Bankr. D.N.J. 1980). The current statute "can be described as a shotgun approach to the situation where a person obtains or retains property upon agreement or subject to a known legal obligation to make a specified payment or other disposition thereof." Id. "This section is not limited to contractors or subcontractors who obtain money and states that the one who violates the section is 'guilty of theft.'" Id. Importantly, it does not "create a trust fund for civil purposes." Id. The fact that the original "trust fund" language was not carried through to the repealed statute's successor establishes that MGHC's reliance on that repealed statute is misplaced.

MGHC fares no better under New Jersey's current Construction Lien Law ("CLL"), N.J. St. Ann. § 2A:44A-1 *et seq.* The relevant provision of the CLL provides that "[a]ny contractor, subcontractor, or supplier who provides work, services, material, or equipment pursuant to a

contract, shall be entitled to a lien for the value of the work or services performed, or materials or equipment furnished in accordance with the contract and based upon the contract price[.]" N.J. Stat. Ann. § 2A:44A-3.  It "offers statutory protection to contractors, subcontractors or suppliers who provide 'work, services, material or equipment,' pursuant to a written contract." Schadrack v. K.P. Burke Builder, LLC, 970 A.2d 368, 373 (N.J. Super. Ct. App. Div. 2009) (citation omitted).  Further, "[t]he statute is designed 'to guarantee effective security to those who furnish labor or materials used to enhance the value of the property of others.'"  Id. (citation omitted).

By its plain language, § 2A:44A-3 is inapplicable here because MGHC is not a "contractor," "subcontractor," or "supplier" as used in the statute.  See N.J. St. Ann. § 2A:44A-2 (defining those terms).  Likewise, MGHC did not perform any work or services or furnish any materials or equipment as the statute contemplates.  Rather, MGHC was the purchaser of the Property, who advanced funds to the seller, Mill Ridge Farm, to make improvements to the Property.  Most importantly, the statute contains no explicit language regarding the creation of a trust.

MGHC relies on language from two cases to support its contention "that construction funds are always held 'in trust' by [t]he developer or contractor as a matter of law."  (Br., DE # 17, at 18 (citation omitted) (emphasis in original).)  In Gallo v. Sphere Constr. Corp., 681 A.2d 1237, 1238 (N.J. Super. Ct. Ch. Div. 1996), the court addressed the issue of "whether a general contractor may file a lien against property under the [CLL] where the property owner terminated negotiations prior to the execution of a written contract for construction."  The court looked to legislative history to determine whether, despite the clear statutory language, contrary legislative

5

intent exists to permit the filing of a valid lien claim in the absence of a written contract. Id. at 1239. The court recognized that the sponsoring senator's statement does not address the issue, but rather, it "details the anticipated results of the [CLL] as envisioned by its sponsor." Id. The court, in the concomitant footnote, states in part, "The bill requires that funds received by owners in connection with the improvement of real property, or by contractors or subcontractors in connection with a contract for improvement of real property, shall constitute assets of a trust." Id. at 1240 n.3. It is this language on which MGHC relies.

It is also relies on similar language from Craft v. Stevenson Lumber Yard, Inc., 843 A.2d 1076 (N.J. 2004). Pertinent to the instant case, in Craft, the New Jersey Supreme Court considered "whether an innocent property owner is liable to a supplier when the owner has paid his general contractor for supplies, which payments were transferred to the supplier without being earmarked, and were not recognized by the supplier as satisfying that property owner's account balance." 843 A.2d at 1079-80. In reversing summary judgment entered in favor of the supplier, the court examined the parties' relationship in the construction industry and ultimately concluded that "a supplier has a duty to determine which of a contractor's projects is the source of its payment and to allocate the payment accordingly." Id. at 1080.

> [I]n the construction industry business is customarily done on credit– the promise the industry lives by. The prime contractor expects to pay his subcontractor from installment payments received from the owner and the materialman depends on the subcontractor to make payment out of the money the latter has received. Each party in the chain fully realizes what business practice requires of him and business stability depends on conformity even when the going becomes rough. The owner likewise has a right to expect that his payments to the contractor will funnel down to those whose work or

> materials enhanced the value of his property. That is likely why the Sponsor's Statement to the bill that became the CLL characterized funds received by a contractor in connection with a contract for an improvement of real property as assets of a "trust" that are intended to
>> [i]nsure[ ] that construction funding actually ends up going to suppliers, subcontractors and contractors who work on the improvement; provides for severe penalties and personal liability upon anyone diverting these assets from their proper construction purposes; *eliminates the age-old problem of "pyramiding" in which construction monies from one project are used to finance other jobs; reduces the possibility of fraud by requiring separate record-keeping for each construction project*; and facilitates honesty and fair dealing by allowing frequent examination and copying of books and records dedicated to each construction project.
>
> [Sponsor's Statement to L. 1993, c. 318 (emphasis added).][5]
> Just as [the general contractor] owed a duty to those below him in the construction chain to pay them what [the property owner] had remitted for their services, it likewise owed a duty to [the property owner] to apply his payments to his bill. That duty was violated when [the contractor] neglected to earmark [the owner's] payments for application by [the supplier]. However, that did not empower [the supplier] to apply [the contractor's] payments to advance its own financial interests. . . . [I]t knew that those payments had to be applied to reduce the property owners' particular indebtednesses.

Id. at 1087 (most citations omitted) (some alterations in original).

The circumstances in both Gallo and Craft are different from those here. Gallo had nothing to do with construction funds not being properly applied to a particular project. Although Craft did, the court's reasoning there rested not on the recognition of a trust relationship, but on the knowledge of the recipient of construction funds (a supplier)– as one

---

[5]At the time of the sponsor's statement, the bill included specific language pertaining to the creation of a trust and the Act was to be entitled "Construction Lien and Trust Law." S.B. 1394, 205th Leg. (N.J. 1992); S.B. 811, 205th Leg. (N.J. 1992). However, that language was not included in the CLL. See N.J. Pub. L. 1993, c. 318.

further down in the "construction chain"– that those funds had to be applied to a certain project to reduce the owner's indebtedness. Without a more explicit holding from the New Jersey appellate courts or express statutory authority, the court concludes a trust has not been created by statute based on the transaction between MGHC and Mill Ridge Farm. Cf. Reliance Ins. Co. v. The Lott Group, Inc., 851 A.2d 766, 774 (N.J. Super. Ct. App. Div. 2004) (holding that the trust imposed by New Jersey's Construction Trust Fund Act[6] extends throughout the contractual chain to any recipient of government construction funds who has knowledge of the public source of those funds).

### 2. Contract

Alternatively, MGHC contends that "Mill Ridge [Farm] was nevertheless contractually obligated to hold [the construction loan funds] in trust to be used for the construction and development of the [Property]." (Br., DE # 17, at 19.)

> In New Jersey, an express trust is created by agreement of the parties, oral or written. New Jersey law does not require the parties to expressly use the word trust in an agreement, as there is no magical phrase that creates a trust. New Jersey does, however, rely to some extent on the Restatement (Third) of Trusts ("Restatement") for guidance.
> Under the Restatement, a trust is a fiduciary relationship over property, arising from a "manifestation of intention to create that relationship" and held for the benefit of "one or more persons, at least one of whom is not the sole trustee." The Restatement also

---

[6]The Act provides:
> All money paid by the state of New Jersey or by any agency, commission or department thereof, or by any county, municipality or school district in the state, to any person pursuant to the provisions of any contract for any public improvement made between any such person and the state or any agency, commission or department thereof, or any county, municipality or school district in the state, shall constitute a trust fund in the hands of such person as such contractor, until all claims for labor, materials and other charges incurred in connection with the performance of such contract shall have been fully paid.

N.J. St. Ann. § 2A:44-148 (1932).

> provides that an enforceable inter vivos trust may be created by declaration, transfer to another as trustee, or by contract. Thus, New Jersey law finds the creation of a trust "when one party pays money to another primarily [dependent] upon their intentions." [*Flint Ink Corp. v. Calascibetta*, No. 06–2517, 2007 WL 2687415, at *6 (D.N.J. Sept. 10, 2007)] (citing *State v. U.S. Steel Co.*, 12 N.J. 51, 58–59, 95 A.2d 740 (1953)); *see Dierksen v. Albert*, 106 N.J. Super. 220, 224, 254 A.2d 809 (N.J. App. Div. 1969) ("It is true that no particular form of words is necessary to create a trust so long as the intent to create the relationship [which] the law denominates a trust is found to exists, in all the circumstances, and the other legal requisites therefor are satisfied.").

In re Ameripay, LLC, No. 09-27794, 2012 WL 246397, at *9 (Bankr. D.N.J. Jan. 25, 2012) (some citations omitted) (alterations in original).

MGHC relies on several provisions of the loan documents to support its position that Mill Ridge Farm had a contractual obligation to hold funds in trust. First, MGHC points to the provision in the purchase and sale agreement setting forth how the purchase price shall be paid. (Br., DE # 17, at 19.) In pertinent part, the agreement provides that MGHC's initial payment shall be used to pay off Mill Ridge Farm's existing mortgage on the Property, with any funds remaining to be paid to Mill Ridge Farm "for construction." (DE # 17-1, at 26.) MGHC would also make additional monthly payments to Mill Ridge Farm

> provided Seller's [i.e., Mill Ridge Farm's] architect has certified in writing to Buyer [i.e., MGHC] that the schedule of completion has been met and all government inspections, as applicable at each stage, have been passed or shall be provided for prior to the next monthly payment as long as the architect certifies that the work for which payment is sought is materially complete and any outstanding inspections are outside the reasonable control of Seller.

(Id. at 26-27.)

In addition, MGHC relies on language in Mill Ridge Farm's mortgage setting forth its

9

purpose of providing security for MGHC's financing construction of the office building.  (Br., DE # 17, at 19 (relying on DE # 17-1, at 68).)  Finally, MGHC draws the court's attention to the promissory note Mill Ridge Farm executed.  MGHC emphasizes that, "unlike a typical note," the note "contemplates construction-related delays" which might extend the note's term, as evidenced by reference to delays caused by "force majeure" and to additional time needed for completion as provided in "change orders."  (Br., DE # 17, at 20 (relying on DE # 17-1, at 56).)

According to MGHC, "[t]aken together, the Loan Documents show that the parties meant for the construction funds to be used to finance the construction of the [Property][,and] [a]s result Mill Ridge [Farm] was . . . contractually obligated to hold those funds in trust for that purpose."  (Id.)  While the obvious intent of the parties was to fund the construction project, these fairly typical loan documents do not thereby transform the parties' relationship to that of trustee and beneficiary.  Stated another way, that the parties contemplated that the funds MGHC paid were to be used for construction does not necessarily mean that they therefore intended to impose a trust on those funds once in Mill Ridge Farm's hands.  The loan documents did not require Mill Ridge Farm to hold the funds received from MGHC in trust.

### 3.  Attendant Circumstances

Finally, MGHC argues that a trust was established by virtue of the circumstances surrounding the loan documents and the development of the Property.  (Id. at 20.)  The thrust of the bankruptcy court's decision rests on its analysis of this issue and led the court to conclude that MGHC and Mill Ridge Farm were in a debtor-creditor relationship.

"Absent a document definitively establishing a trust relationship, [the courts] look to the language of the parties, their conduct, and other circumstances surrounding the transaction

10

probative of their intent." In re Columbia Gas Sys., 997 F.2d 1039, 1060 (3d Cir. 1993); see also U.S. Steel, 95 A.2d at 744 ("The true test of the relationship arises from the nature of the transaction itself and the intent of the parties involved."); Kronisch v. The Howard Sav. Inst., 392 A.2d 178, 180 (N.J. Super. Ct. App. Div. 1978) ("Whether a trust or a debt is created when one party pays money to another depends primarily upon their intent[.]" (citations omitted)). Specifically "[i]n determining whether the parties intended to create a trust or merely a debt," important considerations include:

> "(1) the presence or absence of an agreement to pay interest on the money paid; (2) the amount of money paid; (3) the time which is to elapse before the payee is to be called upon to perform his agreement; (4) the relative financial situation of the parties; (5) the relations between the parties; (6) their respective callings; [and,] (7) the usage or custom in such or similar transactions."

Kronisch, 392 A.2d at 180 (quoting Restatement (Second) of Trusts § 12 cmt. g (1959)).

"Probably the most important determinative of whether a debtor-creditor, as opposed to an informal trust, relationship is created lies in the provisions for the payment or nonpayment of interest." State v. Atlantic City Elec. Co., 128 A.2d 861, 865 (N.J. 1957). While certainly not dispositive, "[w]hen a fixed rate of interest is paid, . . . there is a strong inference that the payee is entitled to use the money to suit his own convenience." Id. (citations omitted). Again while not dispositive, the co-mingling of funds received from the payor with the payee's general funds is also indicative of a debtor-creditor relationship. See Columbia Gas Sys., 997 F.2d at 1060; Kronisch, 392 A.2d at 185; Atlantic City Elec., 128 A.2d at 866.

The court agrees with the bankruptcy court's analysis of this issue. In short, the documents executed by and between MGHC and Mill Ridge Farm established a mortgagor-mortgagee relationship, with the purpose of the mortgage to fund construction; interest accrued

at a fixed rate on the amounts MGHC advanced to Mill Ridge Farm, with such interest to be credited against the purchase price at closing; and, nothing in the loan documents prevented Mill Ridge Farms from co-mingling funds it received from MGHC with any of its other funds.  These factors collectively indicate MGHC's and Mill Ridge Farm's intent to create not a trust, but a debtor-creditor relationship.  The parties' actions were consistent with such a relationship.

That no trust relationship was created as a matter of statutory law, by contract, or through the attendant circumstances means MGHC cannot trace the funds it advanced to Mill Ridge Farm "down the construction chain" to Somerset.  Such a conclusion does not mean, however, that MGHC has no recourse against Mill Ridge Farm (or others).  It means MGHC is limited to pursuing other remedies, such as breach of contract and foreclosure.  With this conclusion, the court now examines whether any of MGHC's claims against Somerset can be maintained.

**B.  Conversion, Civil Conspiracy, and Actual Fraud**

As for the bankruptcy court's rejection of MGHC's claims for conversion and civil conspiracy against Somerset, MGHC asserts no argument separate and apart from the court's purportedly erroneous analysis regarding the existence of a trust.  (See Br., DE # 17, at 31.) Because this court agrees with the bankruptcy court's conclusion that there was no trust, the court will not disturb the bankruptcy court's ruling that the claims for conversion and civil conspiracy fail.  In rejecting MGHC's claim for actual fraud, the bankruptcy court concluded that "the facts belie the allegation that the parties made transfers 'with actual intent to hinder, delay, or defraud any creditor.'" (DE # 1-1, at 13 (quoting N.J. St. Ann. § 25:2-25(a).)  MGHC does not argue that the bankruptcy court's conclusion on the fraud claim should be reversed.

12

C. **Constructive Fraud**

MGHC's claim for constructive fraud is based on the alleged violation of New Jersey's Fraudulent Transfer Act ("FTA"), N.J. St. Ann. § 25:2-20 *et seq*. Specifically, MGHC alleges that Mill Ridge Farm and another entity of which Kevin Wilk is the principal, Mill Ridge Group, made fraudulent transfers to Somerset and others. (Compl., DE # 17-1, at 5, 19-20.) The relevant portion of the FTA deems a transfer fraudulent if the debtor made the transfer "[w]ithout receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor[] [w]as engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction." N.J. St. Ann. § 25:2-25(b)(1) (1989).[7]

> Underlying the Act is the notion that a debtor cannot deliberately cheat a creditor by removing his property from "the jaws of execution." Fraudulent conveyance claims thus allow the creditor to undo the wrongful transaction so as to bring the property within the ambit of collection.

Gilchinsky v. National Westminster Bank N.J., 732 A.2d 482, 488 (N.J. 1999) (citations omitted)).

The bankruptcy court found that MGHC had failed to establish a FTA claim because "[t]he evidence . . . establishes the reasonable equivalency of the value of the transfers among these parties in connection with the development of the New Jersey Property . . . ." (DE # 1-1, at 12.) The court explained:

> From March 2006 to March 2007, Mill Ridge Farm transferred by check $1,288,000 to Wilk and $1,636,100 to Mill Ridge Group.

---

[7]MGHC cites to N.J. Stat. Ann. § 25:2-26. (Br., DE # 17, at 31.) However, the language it quotes is actually within § 25:2-25.

13

> (MGHC made payments to both Mill Ridge Farm and Mill Ridge Group for the development of the New Jersey Property.) In the years 2006 and 2007, Wilk transferred by check $52,000 to Mill Ridge Farm and $1,243,000 to Mill Ridge Group. These transactions do not indicate that MGHC's advances were siphoned; rather, they show that Mill Ridge Group, capitalized through Wilk, managed the construction project for which Mill Ridge Farm had contracted with MGHC. Mill Ridge Farm improved the New Jersey Property as it agreed to do, failing to complete final improvements only when its funding proved insufficient. MGHC has failed to prove a lack of reasonable equivalency.

(Id. at 12-13 n.4.)

MGHC takes issue with the court's findings that MGHC made payments to Mill Ridge Group and that Wilk capitalized Mill Ridge Group, which managed the construction. (Br., DE # 17, at 32 & n.6; Reply Br., DE # 21, at 12 n.9.) Even if the bankruptcy court erroneously found that MGHC had made its payments to both Mill Ridge Farm and Mill Ridge Group, rather than solely to Mill Ridge Farm, given the undisputed transfers between the Mill Ridge entities and Wilk, a logical inference can be drawn that construction was capitalized by Wilk through Mill Ridge Group. Mill Ridge Farm made significant improvements to the Property. It substantially completed the commercial building (which is now occupied with tenants) but did not finish the landscaping and the parking lot. (Haskell Tr., DE # 413,[8] at 14.) MGHC did have to spend approximately $200,000 to $300,000 to finish some parts of the building, such as the heating and sewer systems, and it anticipates having to spend $70,000 to $100,000 to finish landscaping. (Id. at 15-17.) However, it is apparent that the bulk of the multi-million dollar project was completed when Mill Ridge Farm defaulted. That project must have been capitalized somehow, and it is reasonable to conclude that it was done through Wilk and Mill Ridge Group. Accordingly, the

---

[8]Testimony from the bankruptcy court's evidentiary hearing was not filed as a part of the record in this court. The referenced entry is to the bankruptcy court docket.

court concludes that the bankruptcy court's findings that Wilk capitalized the project through Mill Ridge Group and, in turn, that the transfers were of reasonably equivalent value are not clearly erroneous.

### E. Unjust Enrichment

The bankruptcy court concluded that MGHC's claim for unjust enrichment against Somerset cannot stand because there is no evidence of a "direct relationship" between MGHC and Somerset pursuant to which MGHC expected remuneration nor "clear proof that [Somerset] acted wrongfully." (DE # 1-1, at 11.) MGHC contends that the bankruptcy court misapplied the law and argues that it can maintain an unjust enrichment claim against Somerset even in the absence of an expectation of remuneration from Somerset.

In simple terms, "[t]o establish unjust enrichment, a plaintiff must show both that defendant received a benefit and that retention of that benefit without payment would be unjust." VRG Corp. v. GKN Realty Corp., 641 A.2d 519, 526 (N.J. 1994) (citations omitted). A number of cases applying New Jersey law do recite the requirement, as the bankruptcy court did here, that to recover under a theory of unjust enrichment, the plaintiff must show "some direct relationship" between the parties such that the plaintiff expected remuneration from the defendant at the time of conferring the benefit. See, e.g., Stewart v. Beam Global Spirits & Wine, Inc., No. 11-5149, __F. Supp. 2d __, 2012 WL 2523039, at * 5-7 (D.N.J. June 29, 2012); In re Rezulin Prods. Liab. Litig., 390 F. Supp. 2d 319, 343-44 (S.D.N.Y. 2005); Callano v. Oakwood Park Homes Corp., 219 A.2d 332, 334-35 (N.J. Super. Ct. App. Div. 1996). As one of these courts has recently recognized,

> that "some direct relationship" should exist between the parties to an unjust enrichment claim simply reflects the need to curtail the

> reach of this equitable remedy— a so called "legal fiction"— to prevent a finding of liability in cases where the defendant had absolutely no course of dealings with, and no other demonstrated connection to, the plaintiff. The notion that "some direct relationship" exist between the parities is simply meant to preclude a plaintiff from seeking recovery from a defendant whose involvement is too far removed or too attenuated from the facts and circumstances giving rise to the plaintiff's claims.

Stewart, 2012 WL 2523039, at *7.

Arguably an unjust enrichment claim does not rise or fall on the existence of "some direct relationship." See id. However, in the absence of such a relationship, at a minimum the plaintiff must show some wrongful conduct on the part of the defendant such that it would be unjust to allow the defendant to retain the benefit received. See id. at *8 (allowing consumers' unjust enrichment claim to proceed against manufacturer, even though consumers purchased product at issue not directly from manufacturer, because consumers alleged that manufacturer engaged in fraud and made misrepresentations); Callano, 219 A.2d at 335 (finding that plaintiffs are not entitled to recover under theory of unjust enrichment where they had entered into contract with a third-party, had no dealings with defendant, and expected remuneration from the third party at the time the benefit was conferred; and distinguishing another case which allowed recovery for unjust enrichment "because of fraud perpetrated by defendants"). Here, while MGHC may have *alleged* wrongful conduct on the part of Somerset, the bankruptcy court, after hearing evidence on the matter, concluded that MGHC, who has the burden, "offered no clear *proof*" of such conduct. (DE # 1-1, at 11 (emphasis added).) Thus, it properly found that MGHC could not pursue the unjust enrichment claim.

### III. CONCLUSION

For the foregoing reasons, the 12 April 2012 Order of the bankruptcy court is AFFIRMED. The Clerk is DIRECTED to close this case.

This 18 December 2012.

*[Signature]*

W. Earl Britt
Senior U.S. District Judge